Good morning, Your Honors, and may it please the Court, I'm Joshua Hammack on behalf of Mr. Salazar. I'd like to reserve two minutes for rebuttal. Blockbuster video, Butterfinger, Back to the Future. Those three things resolve this entire appeal. That's how simple the statute is. The Video Privacy Protection Act has a one-sentence liability clause. We're focused on a single sentence that prohibits something called a videotaped service provider from disclosing something called personally identifiable information about someone called a consumer. Three separately defined elements. When describing the kind of person protected by the statute, though, the liability clause says, quote, any consumer of such provider, unquote. A consumer of videotapes or videotape services, right? Not at all, Your Honor. Tell me why not. Sure, but can we start please with the videotape service provider. The statute defines it as any person, quote, engaged in the business of rental, sale, or delivery of pre-recorded videocassette tapes or similar audiovisual materials, unquote. Consider Blockbuster, right? To land in a Blockbuster, though, we need time travel. So let's hop in a DeLorean and head back to 1988, the year the DPPA was enacted. Back then, there were hundreds of Blockbusters all over the country, including some right here in New York. Blockbuster is the classic example of a videotape service provider, a brick-and-mortar store engaged in the business of renting, selling, and delivering movies on VHS. But Blockbuster also sold candy and popcorn and keychains and so on. So imagine a time-traveling friend, let's call him Marty McFly, walks into a Blockbuster and buys a Butterfinger candy bar. Blockbuster is still a VTSP. The definition isn't transaction specific. Blockbuster isn't sometimes a videotape service provider and sometimes not. It's always a VTSP because of its general business. Now coming back to the present, the NBA is a bit like Blockbuster was. It's engaged in that same business of renting, selling, delivering pre-recorded audiovisual materials, even if it does other stuff too. So we have a VTSP here. The NBA has never argued otherwise. Now let's move to consumer. But before we turn to the definition, just imagine we take the DeLorean back to the Blockbuster in 88. You see people handing over cash at the register. You see them walking out with their branded Blockbuster bags. And even without looking inside of those bags, you would just colloquially call those people Blockbuster's consumers. Congress did not stray from that very normal linguistic expectation. It defined consumer as, quote, any renter, purchaser, or subscriber of goods or services from a videotape service provider, unquote. Again, Congress used that word any. That's our second textual hint that as to the term consumer, Congress was casting a very wide net. One of the things I'm struggling with, I get literally the words say exactly what you're describing. I understand the argument. And it's hard for me to do the time travel exercise because the fact of consuming video in a capacity that's distinct from the consumer transaction that makes you a consumer, I'm trying to think. I let the people who buy candy stand and watch the video of running there for free. And then Blockbuster discloses the fact that they had done that. And so the consumer who bought the candy is protected from that disclosure. But a consumer who came in and just watched the free movies and then left is not. And that, so bringing it to this case, one of the, I guess, incongruities that I'm trying to sort through is under your interpretation of this statute, an individual who happened to sign up for the newsletter and also watched the videos on the site benefits from the protections of the act, whereas somebody who goes on the site, watches every video there, but never signs up for the newsletter, isn't protected at all. Am I right that that's the consequence? And is that just, we got to live with that because the words say it, or is there an explanation for why that makes sense? Well, I do think that's the consequence, and we have to live with it because that's what Congress enacted. But I do think it makes sense, Your Honor, for the exact reason that Congress expected that the way a videotape service would get access to personally identifiable information was a transaction. That's how they would get your name or your address or your email address or whatever piece of information that would then be disclosed along with the video materials that you watched. May I ask you a practical question about how and why we might have to get into this deep thicket? Your client signed up for a newsletter. As I understand it, this newsletter includes periodic transmission of a curated list of video content, which could constitute a subscription to a video service, but you didn't specifically plead that, so now the question becomes whether your complaint should have been dismissed without prejudice rather than with prejudice. Can you cure that concern if you were allowed to replead? Can you plausibly plead that the signing up for the newsletter is effectively a subscription to a video service or not? I mean, you might as well be candid with us and let us know what we have to deal with here. Absolutely we can. So is that the easier way to deal with this, to find that the district court should not have dismissed with prejudice that the futility determination is the error here? That's an error here, but it's not the primary or it might be the easiest way to handle the problem, but I don't think it's the best way to handle the problem for the simple reason that the district court's entire opinion hinges on a statutory rewrite that is unfounded and just needs to be reversed. Let's think, you know, again, Your Honor, you talked about how you understand that the butterfinger purchaser is a consumer. Let's walk through kind of the final element because this is where I think the district court went wrong. It really ignored the work that personally identifiable information does in the liability clause, and I want to point out here that the definition for personally identifiable information includes requests for specific video materials or services. So imagine our friend Marty McFly standing at the cashier with his butterfinger asks, in kind of a paradoxical way, the blockbuster clerk for a copy, a VHS copy, of Back to the Future. That request gives rise to personally identifiable information and is protected. Blockbuster couldn't disclose that information. That's the piece where Congress required a connection between the individual and the video material, not the definition of consumer. When you were responding to my question earlier, though, you said that they assume implicit in the sharing is the transaction, the consumer transaction. Here, the transaction whereby they're acquiring the information that's being shared is completely independent of the subscription to the newsletter, right? The newsletter doesn't enhance the information that goes to Facebook by virtue of my clicking on the video link while I log into Facebook. That happens whether or not I've subscribed. I'm actually not sure that's true, Your Honor. I think that's a factual question that we'd have to resolve below, but I think... Do you allege that there is information beyond the fact that you've watched that video, namely, are you alleging that information related to your subscription goes to Facebook? I think as part of the subscription, we disclose the cookies that are involved with Facebook. So I think there is a piece of that information that again, the statute doesn't even require that. I thought... I'm sorry to get in the ways of the technology. I thought the cookies were there by virtue of your having Facebook open on your browser and having the site that you're accessing, nba.com, and clicking onto the videos. Tell me the allegations as to how the subscription relates to that. You may be right, Your Honor, in understanding. I'm not going to claim that I understand the technological world, but I think the allegation is that as part of signing up for the newsletter, he disclosed cookies that were related to his Facebook usage. That is an allegation in the complaint. And those cookies in turn were relevant to the operation of Facebook's Pixel? Exactly. It included his Facebook ID, which includes his name and other personal information that has been paired and disclosed as one data point to Facebook, including the videos that he watched. So for those reasons, Your Honor, and for those in our brief, we ask you to reverse. Thank you. All right, thank you. We have some rebuttal. May it please the Court. Matthew Etchemendy, counsel for Appalachian National Basketball Association. We ask the Court to affirm the District Court's dismissal of Mr. Salazar's lawsuit or in the alternative, dismiss for lack of standing. I'd like to focus my time on a few of the points already raised in the argument so far, but I do want to begin with one high-level point. The District Court in this case adopted a clearly correct and entirely reasonable interpretation of the VPPA, particularly when the statute's language is properly interpreted in context and in light of the entire statutory scheme. By my count, at least 16 District Court decisions across the country have adopted the same interpretation of the statute, and that's because the interpretation of the VPPA, the District Court adopted here, is the only one that makes sense textually or practically, and it effectuates the statute's primary purpose. Now, I'd like to turn to perhaps this... Why shouldn't they be allowed to amend? Counsel says that he can amend in a way that says that that newsletter is effectively a video service because it transmits a curated list of video content. So how is it futile to allow him to amend? So amendment would be futile on the interpretation of the VPPA that the District Court adopted, where the rental purchase or subscription must be to video services. If the newsletter includes a periodic transmission of video content, how is it not a subscription to a video service? It may not be your whole library or whatever, but you're basically getting video service through the newsletter. That's what counsel tells me he can plausibly allege. Well, there's been no allegation. There certainly was none in the complaint, and since then there's been no allegation that the newsletters actually contain videos. Now, what Mr. Salazar has suggested, not originally in the complaint but in supplemental filing since then, is that the videos contain links, hyperlinks to pages on nba.com. Right, that's what I understood from the papers. Right, and so that doesn't convert it into a video service because it's really no different from, say, a print newspaper that might contain pointers to movies, curated lists of movie reviews, and so on and so forth. I mean, our brief in this case contains a hyperlink to an NBA. My technical knowledge, I'll admit, is stone age, but if there are links there, you can gain access to the video content for the list the NBA has given you. That's correct. You could click on it and view the video, just like you could also type in nba.com on your browser and then go click on it there. You can get the same video content? Yes, Your Honor. There is absolutely no allegation in this case that any additional video content that's not freely available on the website. Isn't that the valuable thing in the newsletter then? That's what you're selling, is people are interested in getting this video content, subscribe to our newsletter. Well, it's not just video content, it's other things too, but to your question, and I appreciate that, I do appreciate that that's, you know, part of what the NBA is providing here, but I mean, again, that's also part of what people who sell books with a Now you're no longer able to say we're not providing him with any video content, he's getting a letter that says, you know, whatever about what games. Now you don't have that argument anymore. Or am I missing something? Well, I think the missing link here is that the statute actually does provide a definition of the type of video services that are within its scope, the video materials and services. That's in the definition of video tape service provider, where it refers to pre-recorded video cassette tapes or similar audio visual materials. Well, I mean, the tapes we used to get at Blockbuster, there's no machine that plays them anymore, even I know that. The point is, a link is how lots of people get access to video content now. A link is how some people go to or click on to get to a video, but where the video is, is on the website, where it's freely available to anyone. So you click the link, it'll open a browser page, and basically it's just, you know, pasting the address into your browser one step faster than you could anyway. What's the value of the newsletter? Help me out. What is the value of the newsletter if it's not gaining access to that curated group of videos? Well, to update people on all things NBA related, it's headline emails and so on and so forth. So it contains, you know, a lot. Which is also available in newspapers and other things, right? Right, right. Okay, I understand. So the link, the distinction about, oh, they didn't send the video file, they sent a link to access it. I'm just thinking about what a thin distinction that is. When I open up my smart TV and I click on Netflix, I get a whole menu of things and I access, I click on something, that's essentially a link. It's a different link from the link that comes in my email perhaps, but it's a link. That doesn't make Netflix less of a video service provider because it hosts the videos on its browser and I link from my computer rather than sending the whole file to me. Well, I don't think it's a thin distinction. I mean, I think it goes to the question of, is what's actually being delivered something similar to, in the necessary sense, something similar to a pre-reported video cassette tape? Now maybe, and it's not the issue in this case, but maybe one could make that argument if you were being sent actual video files. But that's not what's going on here. It's not what's alleged or even asserted. But if you're thinking about what the law is designed to do, you're trying to figure out what similar to means and understanding that in the context of the law, and your argument is all about context, I don't think that the statute cares about the technology, cares about whether or not my video subscribing, viewing, purchasing, etc. habits are fair game for public disclosure or disclosure to others. Why does it matter? I guess I'm just not understanding why it matters from the statutory language that we're looking at is that they rent, sale, or deliver similar audiovisual materials. Are you saying they can't deliver it if it's on their browser and you're linking to it? Well, what's been delivered in the email isn't an actual video. It's much closer to a situation where, again, you're being given a text piece of paper that says, hey, maybe you should watch this right? I mean, that's different. So it's maybe one step faster than typing it into your browser, but we think that's too thin of a distinction to make. And so, and again, I would emphasize, you know, this is all video material that's freely available on the website. So the notion that he got, you know, some special access to something that he couldn't have just gone to, I mean, that's not in this case at any stage. The final thing that I would point out on this sort of of, you know, are emails like this sufficiently similar to prerecorded video cassette tapes to qualify as that type of material? I do think it's important to look at what some of the practical consequences of that view would be. So one of the implications, for example, seems to be that if that interpretation of the statute is adopted, which Salazar has advanced for the first time on appeal, for example, sales of print New York Times, the fact that someone bought a movie guide would suddenly fall within the scope of the statute. You couldn't disclose information about that. The statute doesn't say you can't disclose that they subscribe to New York Times, right? It says you can't disclose what videos they viewed in the context of perhaps reading the Daily Issue and the New York Times sometimes has videos, right? The statute doesn't reach beyond video. Am I audio video? Am I missing that? Well, it refers to, it says personally identifiable information includes information which identifies a person as having requested or obtained specific video materials or services. So under Salazar's argument that an email that merely contains links to videos qualifies as a video material or service, which I take it is what he's suggesting and, you know, the possibility we've been discussing. On that view, it seems that print copies of newspapers also fall within the statute scope because they have movie reviews, you know, TV guide booklets, all kinds of... Well, they could, if you went with that, and I don't think that that's the consequence, that broad an interpretation, but let's assume that it were a consequence that videotape service provider would be a very broad concept. It's still, the act still only applies when you're disclosing video information. So in your scenario, yeah, the New York Times, what videos you watched on there through, linking through their publication, why is that absurd? Well, or I think the receipt of the publication itself because, you know, if it's a video material or service, then that falls within the scope of PII under the statute. So I was, yeah, I was reading from the definition of PII 2710A3. I see what you're saying. Okay, now let me ask you this since I got here for just a second. I am also just kind of struggling with the literal versus kind of inferring some additional terms that aren't there. So in order to embrace your interpretation, we have to conclude that when they define consumer as a renter, purchaser, or subscriber of goods or services, that they mean a particular kind of good or services, even though they didn't say that. So we have to essentially supply by inference a couple of words into that audio visual goods or services. Am I right that that's what we would have to do to embrace your interpretation? So I don't think the court needs to supply anything that's not already in 2710A1 because it cross references and incorporates the definition of videotape service provider. So a consumer is a renter, purchaser, or subscriber of goods or services from a videotape service provider. I think a perfectly natural way to interpret that language in just about any context is someone who's patronizing a videotape service provider in its capacity as such. But even if that weren't true, it incorporates the definition here of videotape service provider, which has a parallel structure and it defines a videotape service provider as one who's engaged in the business of rental, sale, or delivery of pre-recorded videocassette tapes or similar audio visual material. So putting those together, you have a statute that refers to renters, purchasers, or subscribers of goods or services from people who offer rentals, sales, or deliveries. And rentals, sales, or let's pretend that Walmart has a section of video rentals, which they probably did back in the day, I don't know. Are they a videotape service provider because they have that section but then they also provide all sorts of other consumer goods? So the scope of the term videotape service provider, there's very thin case law on it. I mean what I will say is I'm not aware of any appellate decision getting into it and it hasn't been litigated in this case. It refers textually to a person engaged in a certain business. So I guess the question then would would turn on how central does this have to be to your business to qualify as a videotape service provider, you know, if videos are sort of like one component of a much larger business. That's how the analysis would proceed. I certainly understand Salazar's position to be that anyone who ever sells any video anywhere, even if it's one one-thousandth of what they do, is a videotape service provider as to everything they do, which is what, you know, a lot of the really strange... But your position is either that they're not a videotape service provider at all, which seems like it might really knock the knees out from the purposes of the statute, or that they are but only in their capacity as providing video goods and services. Well, as to the latter, I guess the way I would phrase it is that a consumer of that business is a consumer of goods or services from a videotape service provider only when they patronize that business in its capacity as such as a videotape service provider. Somewhere we're putting in this limiting principle, and I'm just trying to figure out textually where it lives, and when I point it to the definition of consumer, you cross-reference videotape service provider, but now that we're focused on videotape service provider, you're focusing me back to the definition of consumer. Well, the two are intertwined, and, you know, where it lives, where that limitation lives in 2710A1 is in the phrase from a videotape service provider. Now, maybe that language would admit of Salazar's interpretation, potentially, as, you know, as one interpretation. But I think it also perfectly reasonably admits of our interpretation to say, you know, if you are a consumer of goods or services from a particular type of entity, Congress is referring to in that entity's capacity as such. I thought that you had to argue that. I mean, you couldn't really suggest that Congress did not intend to reach Walmart or any, what I'll call, big, you know, multi-department entity insofar as you are a consumer of that product. Now, if you're a consumer of tires or makeup or whatever else, then you can't say, oh, but over in that part of the store they sell videos. I thought your argument is they're selling videos, they fit the definition in that department, and you are a consumer of that product. That's what you're saying is the two things required, or have I misunderstood? No, that's an entirely correct understanding of the argument that we've made here. So, of course, big box stores or whatever can fit within this statute with respect to consumers of that product because they have departments. Now the question is, where the departments are a little hazy here, then how do we deal with it? So, right, and I think, respectfully, I think that the departments are not particularly hazy in this case. It's very clear that the emails subscribed to are separate from Salazar's free viewing of videos on nba.com. There are no allegations in the complaint that there's any relationship between the two. You know, he never says he read the emails, he never says he clicked on them, he doesn't, he certainly... Well, this gets into what an amended complaint might, the sufficiency of an amended complaint, but insofar as when you buy the all games that went into overtime, you know, in finals, and you can clink, you don't have to look for them, that's what you've paid for, you've gotten that, and then you disclose that that's what they were interested in. Why doesn't that come clearly within this statute? Because the email that was subscribed to, you know, simply is not a video service in virtue of the fact that it contains links. I mean, we don't think that's a credible stance, and also, incidentally, this is a theory that was raised for the first time on appeal. The theory that was advanced below in the district court was that in virtue of subscribing to the emails, Salazar was a subscriber of the videos on nba.com. Not that the emails were in themselves somehow video services within the scope of the statute, and I see my time is over. There are no further questions. All right, thank you. Thank you. Just a couple of quick points, your honor. I want to start by pointing out that there's no ambiguity in the statute. The district court didn't find an ambiguity, the NBA has never argued there's an ambiguity, so this whole enterprise... I mean, part of, you know, one of the things that you spend a lot of time on in your brief is this idea of, well, there's no ambiguity in this word, there's no ambiguity in that word, and that the individual words are not ambiguous, but it's really reading the provision as a whole that we're looking at. It's not something a matter of is, are the words goods and services inherently ambiguous? No, they're not, but it's in the context of the statute that we look at the whole thing, and I guess one thing that I've been thinking about is just the fact that this idea that goods and services is not limited to video materials, and I understand there's not a limiting word in there, but the absence of a limiting word does not you know, to my mind, necessarily mean that it is this all-encompassing, it means any goods and services, because it doesn't say any goods and services, it says of goods and services, who knows what that means, but earlier in that same provision when it's talking about being a renter or purchaser, it says in the statute any renter, purchaser, or subscriber, so I mean, to the extent Congress knows how to, as your brief points out, say what it means and mean what it says, they don't have that kind of characterization of goods and services. So I'll start by agreeing, absolutely, that it's taking all those terms in their broader statutory context, not just narrowly looking at individual words or phrases, I think you need to do both, but you need to zoom out too, to take the broader context, and when you do that, you're right that it doesn't say any goods or services, but it also doesn't say video goods or services, or audiovisual goods or services, and Congress knew how to modify terms with the word video when it meant to, when it intended to, it did so in at least three different provisions, even setting aside the term videotape service provider. But there is no question that textual analysis requires context as well as, you know, the isolated group of words, and here having defined the party that's going to be responsible by reference to them offering videos, it seems bizarre that you would think the services or the goods are anything other than the goods or services that relate to videos. I disagree, your honor, and here's why. The definition of VTSP doesn't require that an entity exclusively provide pre-recorded videotapes and other audiovisual materials. It assumes and envisions a world where there are big department stores and blockbusters and so on that, yes, do that one thing, but also do lots of other things too. They sell candy and clothes and all sorts of things. So goods or services can be included in what a VTSP that is a blockbuster or a big box store or whatever can offer. And look at A3, which I think is really critical because it has the same formulation, and it says video materials or services from a videotape service provider. So that modification exists in a parallel provision, two definitions down from consumer, and Congress didn't put it in the definition of consumer. And like I walked through with the example, it didn't need to. VTSP is not a light switch. It doesn't go on and off with every transaction depending on what's included in it. You can have a videotape service provider and you can have a consumer without having personally identifiable information. That's the point I was making earlier. I don't think you need to be concerned with a possibility of having a VTSP and a consumer and not PII. The statute already provides that there's no way. We know what FAA is, this statute, and that's the Disclosure of People's Viewing History, which had all kinds of constitutional implications. Once you're not talking about video services, why would Congress have an interest in or a parallel interest in shielding the non-video consumer? So it's not shielding the consumer. It's not shielding the non-video goods and services necessarily because the three things have to work together. You need to have a VTSP and a consumer and then the link between the consumer as an individual and specific video materials or services. So you need all three. It's shielding PII. That PII relates to a consumer of goods or services of a videotape. So Walmart can disclose the groceries you bought, but they can't disclose the videos you rented? Under the VPPA. Yes, that's right. Can I ask a question? The definition of personally identifiable information includes information about video materials. It uses the term includes rather than consists of, and I'm wondering whether it includes anything else. That seems like a non-inclusive definition, and I'm partly thinking about your colleagues arguing about the fact that you subscribed to this thing that we're now calling video VTSP, whether that would in fact be within the scope of information where it says information about requesting or obtaining specific video materials. Can you help me unpack that? Sure. So I think we're talking here about the newsletter and whether it would count as specific video materials or services, right, in A3's definition of PII. I'm trying to get away from the newsletter. So the hypothetical was if we say video, the New York Times is a video service provider because part of what they provide is a few video links to video stores that they've produced. Right. Then the answer to that is, well, no, because they're not limited in all of their disclosures. They're only limited to disclosing the videos you've linked on. The responsible will know the fact that you subscribe to them if their video service provider becomes PII, and I'm not sure whether it does or not under this definition. I understand your point now much better, Your Honor. Thank you. The answer from our perspective is no. It doesn't prevent New York Times from disclosing your subscription to the New York Times because that information doesn't link you as an individual to anything, any specific video or specific video service. It just links you to a subscription to a newspaper. Right. And the definition is limited to specific video materials. Absolutely. For the same reason that it wouldn't prevent Blockbuster from disclosing Marty McFly's Butterfinger Purchase. Right. It would disclose his request. I'm sorry. It would prevent disclosing his request for Back to the Future, but not his Butterfinger Purchase. The three provisions really work together in unison. You need all three to have liability under the statute. So again, I want to be sure I understand you. So you're saying resolve the consumer, we'll call it broadly, insofar as it applies to any goods or services that the videotape provider is providing, even if it's not directly that. But then what creates liability is having identified that person's request for obtaining of specific video materials or services. It wouldn't be the consumer requesting or obtaining non-video materials. That's exactly right, because that's the word PII does. Exactly. Because remember, again, A3 includes the word video. It has the narrowing language, and A1's definition of consumer does not. So I don't think that there's, first of all, there's no need to insert that narrowing term into A1. The district court kind of did it because it required consumer to do the work of PII. And there's no statutory need to do that. There's no reason to import that term. So again, Your Honours, we ask you to reverse. Thank you very much. Thank you. Thank you both. We'll take the case under advisement.